Filed 12/19/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079883 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. MH107124) |
| SAM CONSIGLIO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Theodore M. Weathers, Judge. Reversed and remanded.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

The Sexually Violent Predator Act (SVPA; Welf. & Inst. Code, § 6600 et seq.)[1] provides that certain convicted sex offenders who have completed their criminal sentences may be civilly committed in a state hospital indefinitely until they no longer present a threat to society. (*In re Lucas* (2012) 53 Cal.4th 839, 845.) Once a person is committed, the SVPA requires the State Department of State Hospitals (DSH) to perform an annual evaluation to determine whether he continues to meet the definition of a sexually violent predator (SVP). (§ 6604.9.) If the DSH determines that the person no longer qualifies as an SVP, it must authorize him to petition the court for an unconditional discharge. (§ 6604.9, subd. (d).) The court must then hold a show cause hearing to determine whether there is probable cause to believe that the committed person no longer qualifies as an SVP, and if so, conduct a full hearing on the issue at which the state bears the burden of proof beyond a reasonable doubt, and the committed person is afforded rights including jury trial, experts, and appointed counsel. (§§ 6604.9, subd. (f), 6605, subd. (a)(1)-(3).)

In 2012, at the age of 61, Sam Consiglio was committed to Coalinga State Hospital (Coalinga) as an SVP. For every subsequent year until 2021, the annual DSH evaluation concluded that he still qualified as an SVP. In 2021, however, a DSH psychologist, Dr. Michelle Vorwerk, performed the annual evaluation and concluded that Consiglio was no longer likely to commit sexually violent predatory crimes because of his age (then 70) and a severe and progressively worsening heart condition that impaired his ability to breathe and exert himself. In a 61-page report, she concluded that Consiglio no longer met the definition of an SVP.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

After Consiglio filed a petition for unconditional release, the trial court held a show cause hearing, rejected Dr. Vorwerk's opinion, and found no probable cause to believe Consiglio was no longer an SVP. Accordingly, the court did not set the matter for a full hearing under section 6605, subdivision (a)(2)-(3). Consiglio appeals from the trial court's probable cause ruling.

We conclude that the trial court failed to apply the proper reasonable person standard for determining probable cause, and improperly rejected Dr. Vorwerk's opinion based on its own personal belief that Consiglio still qualified as an SVP. In so doing, the trial court overstepped its limited authority to make credibility determinations and reject expert opinion at the probable cause stage. Based on our independent review applying the correct probable cause standard, we find that Dr. Vorwerk's opinion and the supporting evidence cited in her report met the low probable cause threshold. Thus, the trial court was required to conduct a further hearing on the issue under section 6605, subdivision (a)(2)-(3).

We emphasize that we are expressing no opinion on the ultimate question whether Consiglio still qualifies as an SVP. On this record, that is solely for the trier of fact to determine after a proper hearing, not for us or the trial court to adjudicate summarily at the probable cause stage. We merely apply the governing probable cause standard to conclude that a full hearing is necessary because *a reasonable person* evaluating the evidence could at least entertain *a strong suspicion* that Consiglio no longer qualifies as an SVP. Accordingly, we reverse and remand for further proceedings in accordance with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

Between 1968 and 2011, Consiglio committed, was convicted of, and served sentences for numerous sexual offenses against women, including

3

forcible rape, aggravated assault, sodomy, and oral copulation. In 2012, at the age of 61, Consiglio was found to be an SVP and committed to DSH for an indeterminate term. (See § 6600 et seq.) In annual DSH evaluations conducted from his commitment up through 2020, psychologists found he still met the criteria for an SVP and he remained involuntarily committed.

In 2020, and again in 2021, DSH psychologist Michelle Vorwerk was assigned to conduct the annual evaluation of Consiglio pursuant to section 6604.9. According to declarations she submitted with her reports, Dr. Vorwerk had been conducting SVP evaluations for DSH since 2013. Sources of information for her 2020 report included a two-and-a-half hour forensic evaluation and interview with Consiglio, standardized risk assessments, treatment team interviews, DSH medical and psychiatric records, and prior SVP evaluations.

Dr. Vorwerk noted in her 2020 report that Consiglio had been diagnosed with paraphilic disorder and antisocial personality disorder, and that he had not completed sexual offender treatment at his facility. She reported that he was 69 years old, suffered from congestive heart failure, and had an ejection fraction of only 20 percent, which meant his heart was functioning at limited capacity.[2] While Consiglio could walk and move around with the help of a wheelchair, he could not walk fast or run. Dr. Vorwerk noted that Consiglio was "declining to have coronary bypass surgery and if he were to elect to have the surgery his ejection fraction could

_____

[2]    According to the American Heart Association, ejection fraction "is a measurement, expressed as a percentage, of how much blood the left ventricle pumps out with each contraction" and "[a] normal heart's ejection fraction may be between 50 and 70 percent." (American Heart Association, Inc. Online (2022) <https://www.heart.org/en/health-topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-measurement> [as of December 19, 2022], archived at <https://perma.cc/VPR3-ADWV>.)

4

improve. At the present time, he is provided some level of protection [against reoffending] due to his coronary heart disease, but it should be noted that this could change if he has the bypass surgery."

Using an actuarial measure of risk for sexual offense recidivism called the "Static-99R" assessment, Dr. Vorwerk determined that Consiglio was in the "Above Average Risk" category for being charged or convicted of another sexual offense. When she evaluated Consiglio using another risk assessment called the "Violence Risk Scale – Sex Offender Version" (VRS-SO), Dr. Vorwerk determined that his score placed him in the "Well Above range" risk category. As for psychopathy, Dr. Vorwerk opined that Consiglio showed a "high degree [of] psychopathy." In light of his Static-99R, VRS-SO, psychopathy, and other risk factors, Dr. Vorwerk concluded that Consiglio still fit the definition of an SVP. She noted that although his coronary disease mitigated his risk to some extent, the possibility that he could have bypass surgery to improve his health made this "protective factor" less relevant.

The following year, in October 2021, Dr. Vorwerk completed another annual evaluation of Consiglio pursuant to section 6604.9. In addition to the sources of information she relied on in 2020, Dr. Vorwerk conducted another one hour and 20-minute video forensic evaluation and interview with Consiglio, interviewed more of Consiglio's treatment team members at Coalinga, consulted updated DSH records, and reviewed outside medical records relating to his heart condition. Dr. Vorwerk wrote a 61-page, single-spaced report discussing topics including Consiglio's psychosocial, medical, and criminal history, as well as his treatment progress, hospital behavior, release plan, and risk assessment results.

Dr. Vorwerk's findings regarding Consiglio's mental disorders, Static-99R and VRS-SO risk scores, degree of psychopathy, and lack of participation in sex offender treatment were essentially the same as the previous year's report. This time, however, Dr. Vorwerk's report contained additional information about Consiglio's heart condition and physical limitations, including information from Consiglio's outside cardiology records from 2017 through 2021, which she did not review as part of her 2020 evaluation.

According to Dr. Vorwerk's summary of these cardiology records, Consiglio's ejection fraction had steadily declined from 25-30 percent in November 2017, to 20 percent in February 2020, and most recently to 15-20 percent in June 2021. The June 2021 result meant that 80-85 percent of his blood remained in the ventricles due to his heart not pumping all the oxygen-infused blood he needed. The unpumped blood remaining in the ventricles backed up into the lungs and caused shortness of breath, which made it difficult for Consiglio to breathe and walk.

In a June 2021 visit with his cardiologist, Consiglio "was experiencing shortness of breath with exertion" and "reported he did not walk often and relied on his wheelchair to get around." He had been diagnosed with coronary artery disease, hypertension, hyperlipidemia, and congestive heart failure, and had undergone coronary intervention of the left anterior descending artery (also known as the " 'widow maker' ") along with the insertion of an intra-aortic balloon pump in 1998.

Consiglio's cardiologist noted: "This patient is quite symptomatic and gets angina after walking for 100 feet distance as well as shortness of breathing. He has severe angina and heart failure symptoms with the minimal exertion as mentioned above. An echocardiogram was performed which revealed severely depressed left ventricle systolic function with

6

ejection fraction of only 15-20%. . . . [¶] . . . [T]his patient has severe heart failure symptoms as well as angina symptoms . . . . [¶] His native coronary artery disease is very severe and [he] is not a candidate for further revascularization."

Dr. Vorwerk tried to speak to Consiglio's cardiologist directly, but was unable to reach him, so she obtained additional information about Consiglio's heart condition from the chief physician at Coalinga, Dr. Jonathan Hamrick. Dr. Hamrick confirmed that Consiglio has a " 'serious heart condition.' " "Bypass surgery was . . . not an option due to the compromised health of his heart." Dr. Hamrick and other physicians opined that Consiglio also is not a good candidate for a heart transplant due to his age and the deterioration of his heart and arteries. In Dr. Hamrick's opinion, there was only a "very minimal chance" that Consiglio would receive a new heart.

According to Dr. Hamrick, Consiglio could walk while pushing his wheelchair with " 'notable deficiency.' " He walked, then stopped and sat in his wheelchair to rest, then walked a distance again. Consiglio experiences shortness of breath due to his limited heart function. Consiglio "could not run and could only walk at a limited capacity."

In Consiglio's 2021 interview with Dr. Vorwerk, he reported that he used a wheelchair as a walker most of the time and sat in it when needed. Consligio also reported he had severe chest pains and shortness of breath, he had stopped exercising, and he could " 'feel [his] heart going downhill.' " He tried using an exercise bicycle in mid-2021, but " 'could not even do a minute' " because he " 'had severe chest pain and shortness of breath.' " Consiglio's understanding was that he was not a candidate for bypass surgery because of his low chance of survival.

Dr. Vorwerk also spoke to Consiglio's medical unit physician, Dr. Nguyen, who saw Consiglio on a daily basis. According to Dr. Nguyen, Consiglio typically used a wheelchair to get around, but sometimes walked behind his wheelchair and then rested. Consiglio's most prominent complaint was shortness of breath and chest pain when walking. Dr. Nguyen believed it was difficult to tell whether Consiglio was actually experiencing chest pain. He explained: " 'For most patients you can see body position you can tell if they are having chest pain and shortness of breath, but I do not see this from Mr. Consiglio.' " In Dr. Nguyen's opinion, it is "unlikely" that Consiglio would receive a heart transplant "as patients over 70 are unlikely to be chosen for a new heart."

A DSH psychiatric technician and DSH social worker both observed that Consiglio did not exercise or go to the courtyard as other patients did. Consiglio typically sat in a wheelchair and used it to get around, but sometimes stood and used it as a walker. According to a DSH nurse, Consiglio sat in the wheelchair 60 percent of the time and walked behind it 40 percent of the time. According to the social worker, however, Consiglio used a wheelchair about 90 percent of the time and was only able to stand for brief durations or walk shorter distances. The DSH nurse told Dr. Vorwerk that Consiglio "requested the doctor clear him for an IT job on the unit" and "reported to the doctor he can walk behind the wheelchair and will be able to complete the job of cleaning the unit including dining tables and doorknobs."

The DSH social worker did not believe Consiglio was ready for discharge. She explained: "I would like to see him participate in [the sexual offender treatment program] and additional recommended groups. I would also like to see him develop better behavioral regulation skills and be able to

implement pro-social coping mechanisms, so that he can approach his problems and concerns in a better manner."

In her 2021 report, Dr. Vorwerk extensively discussed Consiglio's risk factors for sexual recidivism, including his above average risk scores on the Static-99R and VRS-SO, his failure to complete a sex offender treatment program, and his unchanged diagnosis of mental disorders predisposing him to the commission of sexually violent crimes. She then went on to consider a list of potential "protective factors" that could reduce the risk of sexual recidivism. She concluded that there were two such protective factors present: his advanced age (70) and heart disease.

The final sections of Dr. Vorwerk's 2021 report summarized her ultimate opinions on Consiglio's SVP status. Combining Consiglio's scores on the Static-99R and VRS-SO, Dr. Vorwerk concluded that they would yield a sexual recidivism rate of 26.7 percent at five years and 37.6 percent at 10 years. However, she found that Consiglio's protective factors mitigated his risk, specifically, his advanced age and health, including his coronary artery disease.

Dr. Vorwerk acknowledged that Consiglio's "future sex offenses would likely be predatory in nature," but concluded "it is unlikely Mr. Consiglio will have the ability to commit future sexually violent predatory offenses as he did in the past, due to his health and physical condition. It is unlikely he could subdue an adult woman in his current physical state, as he had done in the past."

Dr. Vorwerk also recognized that Consiglio was "an antisocial man with a long history of sexual offending who [she] still ha[d] several areas of concern about." These "issues of concern" included "his poor insight into his sexual problems and seeing no need for sex offender treatment when

9

released." She also noted that Consiglio "shows a high level of internal grievance thinking, hostility, scores high on the [assessment] for psychopathy, continues to exhibit antisocial behaviors on the unit, has ongoing issues with staff at DSH-[Coalinga], and has never participated in [sex offender] treatment."

"Despite these areas of concerns," however, Dr. Vorwerk concluded that "due to his advanced age and current physical/medical condition in my professional opinion he falls just short of likely to commit future sexually violent predatory criminal acts as a result of his diagnosed mental disorders." She explained: "Based on the above information, it is my professional opinion that Mr. Consiglio's current level of risk is not consistent with the estimates provided above and he is not 'likely' to engage in predatory sexually violent criminal behavior as a result of his diagnosed mental disorder due to his extensive health issues. Mr. Consiglio currently does not present as a substantial danger, or serious and well-founded risk, of committing future sexually violent predatory acts as defined by . . . § 6600. It is therefore my opinion that Mr. Consiglio no longer meets the legal definition of a[n SVP] and is ready for unconditional release."

In a declaration accompanying her report, Dr. Vorwerk further explained: "To date, Mr. Consiglio has not completed sexual offender treatment program . . . and he has not had sufficient treatment for his diagnosed mental condition and other dynamic risk factors. However, despite these concerns at this time unconditional release is appropriate as he is not 'likely' to engage in predatory sexually violent criminal behavior as a result of his diagnosed mental disorder due to his age as well as extensive medical and health issues."

10

The medical director of Coalinga transmitted Dr. Vorwerk's report and declaration to the court with a cover letter. His cover letter stated: "I am **not in agreement** with the evaluator's findings and the recommendation made in this report." However, the medical director gave no reasons for his disagreement. No additional evaluations were conducted by DSH in connection with the subsequent court proceedings.

In November 2021, Consiglio petitioned for unconditional release pursuant to sections 6604.9 and 6605.[3] In December, the People filed a response and attached all of Consiglio's SVP evaluations from 2014 through 2021. The court held a show cause hearing, at which it allowed Consiglio to submit his 2017-2021 cardiology records, including an October 2021 office visit when Consiglio complained of shortness of breath and chest pain lasting a few minutes to an hour. At that visit, Consiglio reported that he walked "very little" and was using a wheelchair and the cardiologist found that his ejection fraction was again 15-20 percent with "evidence of severe depressed iv systolic function." The parties submitted no additional evidence.

After hearing arguments at the show cause hearing, the trial court rejected Dr. Vorwerk's opinion that Consiglio was no longer an SVP. The court concluded that it was not required "to simply accept" Dr. Vorwerk's evaluation in making the probable cause determination and could assess her credibility by reference to CALCRIM No. 332, the standard jury instruction

---

[3] The People do not dispute that Consiglio had a right to petition for unconditional release based on Dr. Vorwerk's 2021 evaluation, notwithstanding the medical director's letter disagreeing with her findings and recommendation. (*People v. Landau* (2011) 199 Cal.App.4th 31, 37-40.)

11

on evaluating expert witness testimony.[4]  The court found it "very significant" that Dr. Vorwerk believed Consiglio fell " 'just short' " of SVP status, particularly "in light of her evaluation of the year before."  The court also expressed its belief that Dr. Vorwerk relied on two "protective factors" (age and health) but failed to incorporate the "dangerousness factors" into her opinion.  Finally, the court stated:  "Based upon the authority given by CALCRIM [No.] 332 and taking all of this information as a whole, the Court believes that it's important to reject Dr. Vorwerk's opinion.  And I don't believe that . . . [Consiglio's] condition has so changed that he no longer qualifies as an SVP.  [¶]  I don't believe that based upon these reports, that petitioner has met its burden of proof."

Consiglio timely appealed.

DISCUSSION

A. *Statutory Framework*

Under the SVPA, an offender who is determined to be an SVP is subject to involuntary civil commitment for an indeterminate term upon release from prison.  (§§ 6601-6604.)  The SVPA is designed " ' "to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to

---

4      The court stated:  "I turn to CALCRIM [No.] 332, which is the jury instruction we give regarding expert witness testimony.  And we tell the jurors that:  'You must consider the opinions of the expert, but you are not required to accept them as true or correct.  [¶]  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  [¶]  In addition, consider the expert's knowledge, skill, experience, training, and education, []the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied on [*sic*] was true and accurate.' "

12

the public.  [Citation.]  Thus, '[t]he SVPA is not punitive in purpose or effect,' and proceedings under it are ' "special proceedings of a civil nature." ' " (*People v. Putney* (2016) 1 Cal.App.5th 1058, 1065; accord *People v. Smith* (2020) 49 Cal.App.5th 445, 451.)

To establish that an offender is an SVP, the state must prove beyond a reasonable doubt that the offender (1) has been convicted of a sexually violent offense against at least one victim, and (2) has a diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent criminal behavior.  (§§ 6600, subd. (a)(1), 6604.)  The statute also contains an "implied requirement . . . that the defendant is likely to commit sexually violent *predatory* criminal acts . . . ." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186 (*Hurtado*).)  " 'Likely,' in this context, does not mean more likely than not; instead, the standard of likelihood is met 'when "the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." ' " (*People v. Shazier* (2014) 60 Cal.4th 109, 126.)

For the initial commitment, "[t]he SVPA provides for both a preliminary probable cause hearing and a later trial." (*Hurtado*, *supra*, 28 Cal.4th at p. 1186.)  At the probable cause hearing, the court must "determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).)  This probable cause determination encompasses all the elements required for civil commitment as an SVP.  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 246-250 (*Cooley*).)  If the court finds probable cause, it must then conduct a trial to determine whether the person qualifies for commitment as an SVP. (§ 6602, subd. (a).)  The person is entitled to a jury trial, assistance of

counsel, appointed counsel, experts or professional persons to perform an examination on the person's behalf, and access to all relevant medical and psychological records and reports. (§ 6603.)

Once someone is committed as an SVP, he remains in custody until he successfully petitions for unconditional discharge under section 6605 or conditional release under section 6608. Alternatively, if DSH develops reason to believe the person no longer qualifies as an SVP, it must file a petition for writ of habeas corpus seeking the person's unconditional discharge. (§§ 6605, subd. (c), 7250.)

Section 6604.9 requires DSH to examine the mental condition of a committed SVP on an annual basis and submit to the court a report prepared by a professionally qualified person. Section 6604.9, subdivision (d), states that if DSH determines that "the person's condition has so changed that the person no longer meets the definition of a sexually violent predator and should, therefore, be considered for unconditional discharge," then "the director shall authorize the person to petition the court for . . . unconditional discharge." After such a favorable DSH evaluation, "the SVP is strongly presumed to be entitled to unconditional discharge . . . ." (*People v. Peyton* (2022) 81 Cal.App.5th 784, 798.)

Section 6605, subdivision (a), provides that when a court receives a petition for unconditional discharge, it must hold a "show cause hearing" to determine whether "probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged . . . ." If the trial court determines such probable cause exists, "then the court shall set a hearing on the issue" and the committed person "shall be entitled to the benefit of all

14

constitutional protections that were afforded to him or her at the initial commitment proceeding," including "the right to demand a jury trial and to have experts evaluate him or her on his or her behalf." (§ 6605, subd. (a)(2)-(3).) At the hearing, the burden of proof is "on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (§ 6605, subd. (a)(3).)

B. *Probable Cause Standard*

As noted, this appeal is from the trial court's determination of no probable cause to conduct a full hearing under section 6605, subdivision (a). As an initial matter, the parties dispute the legal standard for determining probable cause in this context. Consiglio contends that "probable cause" under 6605 should be construed as being akin to the "prima facie" standard used in habeas proceedings. The People disagree and argue that an SVP's evidentiary burden to establish probable cause is similar to the burden the prosecution bears in a felony preliminary hearing.

We agree with the People. In *People v. Hardacre* (2001) 90 Cal.App.4th 1392 (*Hardacre*), the Court of Appeal concluded that "[t]he SVP at a show cause hearing [under section 6605, subdivision (a)] has an evidentiary burden similar to the prosecution's burden at the preliminary hearing in a felony case: both must establish probable cause to believe in the existence of the requisite facts. At the preliminary hearing, the prosecutor must establish probable cause that an offense has been committed and the accused is guilty of it. [Citation.] At the show cause hearing, the SVP must establish probable cause to believe that his mental condition has changed so that he is no longer a danger to others." (*Id.* at p. 1402.)

15

As the Supreme Court subsequently explained in *Cooley*, *supra*, 29 Cal.4th at p. 251: "Although the term 'probable cause' is not defined in the SVPA, 'the rule of law is well established that where the Legislature uses terms already judicially construed, the "presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts." ' " Because the term "probable cause" already had a well-defined meaning in the felony preliminary hearing context, the court concluded that the Legislature "intended an analogous definition and application of this term in the context of this civil commitment scheme." (*Id.* at p. 252.)

Under the well-established probable cause standard at a preliminary hearing, "magistrates do not themselves decide whether the defendant is guilty." (*Cooley*, *supra*, 29 Cal.4th at p. 251.) Rather, "the magistrate's role is limited to determining whether *a reasonable person* could harbor a strong suspicion of the defendant's guilt, i.e., whether such a person could reasonably weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses in favor of harboring such a suspicion." (*Id.* at pp. 251-252.) The Supreme Court has described this as "an 'exceedingly low' standard." (*People v. Superior Court* (*Sahlolbei*) (2017) 3 Cal.5th 230, 245.)

Based on its conclusion that the Legislature must have intended an analogous definition of probable cause in the SVP context, the *Cooley* court ruled that under section 6602, "a determination of probable cause by a superior court judge under the SVPA entails a decision *whether a reasonable person could entertain a strong suspicion that the offender is an SVP.*" (*Cooley*, *supra*, 29 Cal.4th at p. 252.) Although "the superior court may evaluate the validity of any evidence presented by an expert, as well as judge

16

the credibility of any expert who testifies at the hearing," the *Cooley* court emphasized that any such "credibility determination to be made at the probable cause stage . . . is a gross and unrefined one." (*Id*. at p. 257.) For the superior court to reject evidence "at the probable cause stage, either the evidence presented must be inherently implausible, the witnesses must be conclusively impeached, or the demeanor of the witnesses must be so poor that no reasonable person would find them credible. . . . The superior court may not substitute its own personal belief as to the ultimate determination to be made at trial for that of a reasonable person evaluating the evidence." (*Id*. at p. 258.) Much like a criminal preliminary hearing, a probable cause hearing in the SVP context "serve[s] to ' " 'weed out groundless or unsupported charges.' " ' " (*Id*. at p. 247; *Walker v. Superior Court* (2021) 12 Cal.5th 177, 197.)

Although *Cooley* involved the initial pre-commitment probable cause hearing under section 6602, there is no reason to suppose the Legislature intended a different meaning of "probable cause" for a show cause hearing under section 6605. As the court said in *Cooley*: " '[A] word or phrase will be given the same meaning each time it appears in a statute . . . .' " (*Cooley*, *supra*, 29 Cal.4th at p. 255; see also *People v. Cheek* (2001) 25 Cal.4th 894, 899-901 [noting resemblance between sections 6602 and 6605 because they use "parallel language" and finding nothing to suggest that a "probable cause" hearing in section 6605 should differ from section 6602].) We therefore conclude that the probable cause standard under section 6605 is the inverse of the probable cause standard under section 6602; it "entails a decision *whether a reasonable person could entertain a strong suspicion that*

*the offender is* [*no longer*] *an SVP."* (*Cooley*, at p. 252.) This is consistent with the holding of *Hardacre.* (*Hardacre, supra*, 90 Cal.App.4th at p. 1402.)[5]

We reject Consiglio's argument that a lower standard of probable cause should apply as a result of the enactment of Proposition 83, approved by voters on November 7, 2006, also known as "The Sexual Predator Punishment and Control Act: Jessica's Law." Although Proposition 83 amended other provisions of the SVPA, the drafters and voters did not alter the "probable cause" language previously construed in *Cooley* and *Hardacre.* Thus, we must presume that they intended to leave the judicially adopted definition of "probable cause" unchanged. "The Legislature is presumed to have knowledge of existing judicial decisions when it enacts and amends

---

[5] The language of section 6605 states that the court must determine whether "probable cause exists to believe that the committed person's *diagnosed mental disorder has so changed* that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged . . . ." (Italics added.) Here, there is no evidence that Consiglio's diagnosed mental disorder has changed; the question is whether his health and physical condition have deteriorated to the point that he no longer satisfies the SVP requirement of being likely to commit future sexually violent predatory crimes. The People conceded below and do not dispute on appeal that someone who is committed as an SVP may qualify for discharge based on such a change in physical condition alone. In *Cooley*, the Supreme Court held that the initial probable cause determination under section 6602 encompasses all elements of SVP status, even though the statutory language does not explicitly refer to them all. (*Cooley, supra*, 29 Cal.4th at pp. 246-250.) We conclude that the same is true of the probable cause determination under section 6605. Even without a change in diagnosed mental condition, probable cause exists if there is probable cause to believe that the committed person is no longer likely to engage in future sexually violent predatory conduct. This is consistent with the principle that "[a]n SVP may be held . . . 'as long as he is *both* mentally ill *and dangerous, but no longer.'*" (*People v. McKee* (2010) 47 Cal.4th 1172, 1193, italics added; see also *id.* at p. 1194 ["a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness"].)

18

legislation. When the Legislature amends a statute that has been the subject of judicial construction, changing it only in part, the presumption is that the Legislature intended to leave the law unchanged in the aspects not amended." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 642-643.) These same principles of statutory interpretation apply to ballot initiatives. (See, e.g., *People v. Weidert* (1985) 39 Cal.3d 836, 844 [enacting body deemed to be aware of existing laws and judicial constructions in effect at time initiative is enacted].)

C. *Standard of Review*

When reviewing a probable cause determination made under the SVPA, the applicable standard of review depends on whether the trial court rendered findings of fact. (*Cooley*, *supra*, 29 Cal.4th at p. 257.) If the trial court made findings of fact, they are conclusive if supported by substantial evidence. (*Ibid.*) Otherwise, the trial court's probable cause ruling is treated as a question of law subject to independent review on appeal. (*Ibid.*, citing *People v. Slaughter* (1984) 35 Cal.3d 629, 638.) "The question, then, is whether the evidentiary record of the show cause hearing disclosed a rational basis for believing that [the SVP] was no longer a danger to others, accepting any factual findings made by the trial court to the extent they were supported by substantial evidence." (*Hardacre*, *supra*, 90 Cal.App.4th at p. 1402, italics omitted.) "The nature of an appellate court's review of the lower court's probable cause determination does not vary according to the type of evidence—whether it be lay or expert testimony." (*Cooley*, at p. 258.)

D. *Analysis of Probable Cause Determination*

We must first decide whether the court made factual findings as part of its probable cause ruling. While the court made no express factual findings, we conclude it made an implied finding that Dr. Vorwerk's opinion was not

19

credible or persuasive by applying CALCRIM No. 332 on evaluating expert witness testimony and rejecting her opinion that Consiglio no longer qualified as an SVP.

We would normally begin our analysis by deciding whether this implied finding is supported by substantial evidence. (*Cooley*, *supra*, 29 Cal.4th at p. 257; *Hardacre*, *supra*, 90 Cal.App.4th at p. 1402.) Before we turn to that question, however, we must consider whether the trial court applied the correct probable cause standard in rejecting Dr. Vorwerk's opinion. As we have noted, the trial court's authority to decide credibility issues in determining probable cause is only "a gross and unrefined one" because the relevant question is not whether the court itself believes the person no longer qualifies as an SVP, but whether "a reasonable person evaluating the evidence" could so believe. (*Cooley*, at pp. 257-258; see also *id.* at pp. 251-252.) At the probable cause stage, therefore, the court may reject evidence only if it is "inherently implausible," the witness is "conclusively impeached," or her demeanor is "so poor that no reasonable person would find them credible."[6] (*Id.* at p. 258.) Only in such limited circumstances is it

---

[6] A court may also reject the opinion of an SVP evaluator if it is based on an erroneous interpretation of the legal standard for SVP commitment. (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 895, 909-915.) However, the People make no such claim as to Dr. Vorwerk's 2021 evaluation. In addition, we believe a court may be able to reject an SVP evaluation at the probable cause stage if the material relied on by the expert does not provide a reasonable basis for the opinion offered. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770-771 [addressing admissibility of expert opinions].) We need not decide this question, however, because the trial court made no such finding, the People do not argue it, and Dr. Vorwerk at least had a reasonable basis for her opinion for the reasons we describe in this opinion.

permissible for the court to find that no reasonable person could give credence to the evidence.

The trial court did not apply this reasonable person standard in making its probable cause ruling. It made no reference to what a reasonable person evaluating the evidence could conclude. It made no finding that Dr. Vorwerk's opinion was inherently implausible or conclusively impeached or her demeanor so poor that no reasonable person could credit her opinion. Instead, the court applied the standard jury instruction for evaluating expert testimony just as if it were the ultimate trier of fact; it invoked this jury instruction as a basis for rejecting Dr. Vorwerk's opinion; and it substituted its own personal belief as to Consiglio's SVP status by stating, "*I don't believe that [Consiglio's] . . . condition has so changed that he no longer qualifies as an SVP.*"

At the probable cause stage, the court "may not substitute its own personal belief as to the ultimate determination to be made at trial for that of a reasonable person evaluating the evidence." (*Cooley*, *supra*, 29 Cal.4th at p. 258.) The court's "personal opinion" on the ultimate issue "is of no legal significance." (*Id* at p. 251.) Because the trial court based its ruling on its own personal belief that Consiglio still qualified as an SVP—and did not assess what a reasonable person evaluating the evidence could conclude—it applied the wrong standard in rejecting Dr. Vorwerk's opinion at the probable cause stage.

Even if the trial court had applied the correct reasonable person standard, however, we would still conclude that its implied factual finding as to Dr. Vorwerk's credibility was not supported by substantial evidence. In *People v. Bautista* (2014) 223 Cal.App.4th 1096 (*Bautista*), the court applied *Cooley* in evaluating a magistrate's rejection of a prosecution expert's opinion

21

at a preliminary hearing. The court stated that even if the magistrate made a credibility finding in rejecting the expert's testimony, "it was not supported by substantial evidence due to the magistrate's limited role in making credibility determinations" when assessing probable cause. (*Id*. at p. 1102.) The Court of Appeal reasoned that the expert's testimony was not inherently improbable or conclusively impeached, and the magistrate made no finding that his demeanor was so poor that no reasonable person would find him to be credible. (*Ibid*.)

Similarly, none of these grounds for rejecting Dr. Vorwerk's expert opinion at the probable cause stage existed here. There is nothing in the record to support a conclusion that Dr. Vorwerk's 2021 opinion as to Consiglio's SVP status was inherently improbable, and the People presented no evidence conclusively impeaching her findings. Although the Coalinga medical director stated his disagreement with Dr. Vorwerk in his cover letter to the court, he gave no explanation why he disagreed. No live testimony was presented, so the trial court was not in a position to consider Dr. Vorwerk's demeanor. Accordingly, we conclude that the trial court's rejection of Dr. Vorwerk's expert opinion is "not supported by substantial evidence due to the [court]'s limited role in making credibility determinations" when assessing probable cause. (*Bautista, supra*, 223 Cal.App.4th at p. 1102.)

Because the trial court's factual finding is not supported by substantial evidence in this context, we must review the record independently to determine whether a reasonable person evaluating the evidence could harbor a strong suspicion that Consiglio no longer presents a substantial danger of committing sexually violent predatory crimes if free in the community. (*Cooley, supra*, 29 Cal.4th at p. 257; *Hardacre, supra*, 90 Cal.App.4th at p. 1402.) Based on Dr. Vorwerk's expert opinion, her detailed report, and the

information she relied on in reaching her opinion, we find that a reasonable person could harbor such a suspicion.

As Consiglio points out, Dr. Vorwerk is an experienced SVP evaluator who made extensive findings based on her forensic evaluations and interviews of Consiglio, his psychosocial and criminal history, standardized risk assessments, treatment team interviews, medical and psychiatric records from DSH, outside cardiology records, and previous SVP evaluations. The People do not suggest that Dr. Vorwerk used an invalid assessment protocol or relied on improper factors in making her SVP evaluation. Notably, Dr. Vorwerk is the expert the state itself designated to evaluate Consiglio in 2020 and again in 2021, and she used the same protocol both years. Moreover, she articulated a reasonable basis for her 2021 opinion that Consiglio no longer presented a substantial danger of committing sexually violent predatory crimes based on his advanced age, severe and worsening heart disease, and significant physical limitations. Although the evidence would not *compel* a finding that Consiglio no longer qualifies as an SVP—and the trier of fact could ultimately decide to reject Dr. Vorwerk's opinion after a full hearing—her professional opinion and the supporting information is at least enough to satisfy the " 'exceedingly low' " probable cause standard. (*Sahlolbei, supra*, 3 Cal.5th at p. 245.)

None of the concerns expressed by the trial court would preclude a reasonable person from crediting Dr. Vorwerk's expert opinion as to Consiglio's SVP status. First, the court found it "very significant" that Dr. Vorwerk opined Consiglio fell " 'just short' " of SVP status in 2021, particularly "in light of her evaluation of the year before." But the mere fact that Dr. Vorwerk may have considered Consiglio's SVP status to be a close question in 2021 would not make it irrational for a reasonable person to

23

agree with her that Consiglio no longer qualified as an SVP. Whether Consiglio fell just short of SVP status or far short, Dr. Vorwerk's professional opinion was that he no longer met it.

Dr. Vorwerk's unfavorable evaluation in 2020 also does not supply a basis to dismiss her 2021 evaluation at the probable cause stage. Whenever someone who is committed as an SVP receives a favorable annual DSH evaluation for the first time, there will always be an unfavorable evaluation from the prior year. The record here affirmatively discloses that Dr. Vorwerk had rational reasons for changing her opinion between 2020 and 2021. Specifically, Consiglio's ejection fraction had declined even further in 2021; Dr. Vorwerk had access to his outside cardiology records which she did not review in 2020; she had new information from multiple sources regarding Consiglio's shortness of breath and limited capability for physical exertion; and she had new information that Consiglio was not a good candidate for either bypass surgery or a heart transplant, significantly reducing his odds of regaining physical strength. In fact, a reasonable person could find Dr. Vorwerk's 2021 opinion to be credible precisely because she obtained and considered new information and reached a different conclusion—and did not just take the easy path by reflexively repeating what she had previously done in 2020.

Second, the trial court stated its belief that Dr. Vorwerk relied exclusively on the two "protective factors" (age and health) but did not incorporate the "dangerousness factors" into her opinion. Once again, however, a reasonable person reviewing Dr. Vorwerk's detailed report could reach a contrary conclusion. Dr. Vorwerk provided a thorough analysis of Consiglio's Static-99R and VRS-SO assessments indicating a risk of recidivism, as well as his lack of treatment and unchanged mental diagnosis.

24

In stating her final opinion in her 2021 report, she specifically noted that she still had "several areas of concern" about Consiglio, including "his poor insight into his sexual problems and seeing no need for sex offender treatment when released," as well as "a high level of internal grievance thinking, hostility, scores high on the [assessment] for psychopathy, continues to exhibit antisocial behaviors on the unit, has ongoing issues with staff at DSH-[Coalinga], and has never participated in [sex offender] treatment."

Ultimately, however, it was "[d]*espite* these areas of concerns" that Dr. Vorwerk concluded Consiglio fell short of the definition of an SVP "due to his advanced age and current physical/medical condition[.]" (Italics added.) Weighing the protective factors against the risk factors, Dr. Vorwerk concluded "that Mr. Consiglio's current level of risk is not consistent with the estimates provided above [from the Static-99R and VRS-SO assessments] and he is not 'likely' to engage in predatory sexually violent criminal behavior as a result of his diagnosed mental disorder due to his extensive health issues." On this record, a reasonable person could conclude that Dr. Vorwerk conscientiously weighed all the risk factors against the protective factors in reaching her ultimate opinion.

Finally, the trial court quoted at length from portions of Dr. Vorwerk's report suggesting that Consiglio still may present a risk of reoffending, including conflicting statements about whether he could still achieve an erection, his prior statements about exercising in 2020, his refusal of medications, his long history of sexual offenses, his lack of treatment, and his Static-99R and VRS-SO scores. We readily acknowledge that there is evidence in the record from which a trier of fact could conclude that Consiglio still qualifies as an SVP. But it does not follow that a reasonable person

25

could not harbor a strong suspicion to the contrary based on Dr. Vorwerk's opinion and the supporting information. Dr. Vorwerk considered and thoroughly discussed all the evidence cited by the trial court, but none of it conclusively refuted her professional opinion that because of Consiglio's severe and deteriorating heart condition and significant physical limitations, he no longer presented a substantial danger of committing future sexually violent predatory acts.

The People acknowledge that the trial court rejected Dr. Vorwerk's expert opinion as an experienced SVP evaluator, but contend that the court was entitled to do so because there was "a difference of professional opinion as to whether [Consiglio]'s heart health rendered him no longer dangerous." According to the People, "rather than agree with Dr. Vorwerk's ultimate opinion, the trial court agreed with the opinions of the medical director, unit physician, registered nurse, and social worker."

But again, the question is not how the trial court itself would resolve any conflicts in the evidence if it were the ultimate trier of fact. Rather, at the probable cause stage, the question is whether "*a reasonable person* . . . could reasonably weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses in favor of harboring . . . a [strong] suspicion" that Consiglio no longer qualifies as an SVP. (*Cooley, supra,* 29 Cal.4th at pp. 251-252.)

The People do not explain why a reasonable person could not weigh the evidence and resolve any conflicts in favor of a strong suspicion that Dr. Vorwerk's opinion was correct. The medical director's letter to the court merely stated in conclusory terms that he disagreed with Dr. Vorwerk, without stating any reasons or supporting facts. An expert opinion is only as good as the facts and reasons on which it is based. (*Howard v. Owens*

26

*Corning* (1999) 72 Cal.App.4th 621, 633.) A purely conclusory opinion unaccompanied by a reasoned explanation "has no evidentiary value." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)

The other professionals cited by the People did not give any opinion one way or the other as to whether Consiglio still met the definition of an SVP or was physically capable of engaging in sexually violent predatory conduct. Dr. Nguyen told Dr. Vorwerk it was "difficult to assess Mr. Consiglio's condition due to how often he complains" and it was "difficult to tell" whether Consiglio was really experiencing chest pain. The nurse reported that Consiglio did not appear to be fatigued when he walked behind his wheelchair for unspecified distances and did "not appear to experience shortness of breath since he does have the wheelchair and is able to sit down when needed." The social worker believed Consiglio was not ready for discharge because he had not participated in sexual offender treatment programs and needed to develop better behavioral regulation skills and coping mechanisms. But none of these individuals reviewed Consiglio's cardiology records, conducted the type of comprehensive SVP evaluation Dr. Vorwerk did, or provided any opinion as to his SVP status or physical ability to commit a sexually violent predatory assault. Thus, none of their statements so conclusively impeached Dr. Vorwerk's professional opinion that no reasonable person could give it credence.

We therefore conclude that probable cause exists under section 6605, subdivision (a), because a reasonable person could entertain a strong suspicion that Consiglio no longer meets the definition of an SVP.[7]

---

[7] Because we reverse the trial court's probable cause determination, we need not decide the other constitutional issues raised by Consiglio.

DISPOSITION

The trial court's order finding no probable cause under Welfare and Institutions Code section 6605, subdivision (a) is reversed. The case is remanded for the trial court to set the matter for a full hearing under section 6605, subdivision (a)(3) and conduct further proceedings consistent with this opinion.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.